IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

COREY MONPAS, an individual,

        Plaintiff,

v.

MULTNOMAH COUNTY, a political
Subdivision of the State of Oregon, and
JOHN DOES 1-10,

        Defendants.

3:23-cv-1006-HZ

OPINION & ORDER

Michelle R. Burrows
16869 S.W. 65th Avenue # 367
Lake Oswego, OR 97035

        Attorney for Plaintiff

Christopher A. Gilmore
Multnomah County Attorney
501 S.E. Hawthorne
Suite 500
Portland, OR 97214

        Attorney for Defendants

1 - OPINION & ORDER

HERNÁNDEZ, Senior Judge.

This matter comes before the Court on Plaintiff's Motion to Substitute Parties, ECF 19, and Defendants' Motion for Summary Judgment, ECF 20. For the reasons that follow, the Court denies Plaintiff's Motion and grants Defendants' Motion.

## BACKGROUND

On July 12, 2021, Portland police officers were called to a scene where Plaintiff Corey Monpas had smashed several vehicles' windows. When police arrived Plaintiff was extremely animated, yelling, making delusional statements about someone trying to kill him, and saying he had a knife and had cut himself several times. Officers believed Plaintiff was under the influence of drugs or alcohol or experiencing a mental-health crisis. Plaintiff was arrested by Portland police and charged with assault, vandalism, and animal cruelty. Plaintiff was transported by police to the Multnomah County Detention Center ("MCDC"). Before Plaintiff arrived at MCDC, Portland police informed jail staff that Plaintiff was uncooperative and likely under the influence of drugs or alcohol and/or exhibiting signs of mental illness.

At 7:45 p.m. police officers attempted to remove Plaintiff from the police vehicle at MCDC, but Plaintiff resisted their efforts. Multnomah County Sheriff's Sergeant Morgan Olsen approached Plaintiff and asked him if he knew where he was and what had happened. Plaintiff yelled nonsensical statements and said he was going to be crucified. Plaintiff slid to side of the police vehicle away from Olsen. Sheriff's Deputy Gustavo Valdavinos went to Plaintiff's side of the vehicle and pushed Plaintiff towards Olsen and Sheriff's Deputy Derrick Daley and they managed to remove Plaintiff from the vehicle. Plaintiff resisted being put in a wheelchair, stiffening his body to prevent being seated, and jail staff were required to hold his legs and carry

him into MCDC while Plaintiff continued to yell obscenities. At the booking counter, Sheriff's

Deputy Ashley Swalley tried to remove Plaintiff's necklaces pursuant to MCDC booking policy

and Plaintiff attempted to bite her. Olsen determined it was unsafe to proceed with the booking

process because of Plaintiff's continued verbal barrage and physical struggle. Olsen decided

Plaintiff should be placed in an isolation cell. Plaintiff physically resisted staff bringing him to

the isolation cell.

      Immediately after entering the isolation cell Plaintiff and jail staff ended up on the ground

and Plaintiff struck his shoulder. Plaintiff, however, continued to struggle with jail staff. Plaintiff

admitted at deposition that he was actively resisting jail staff and would not roll on to his back

because he believed they were trying to kill him. Plaintiff kicked at deputies to prevent them

from turning him on to his back to search his front pants pockets. Olsen placed one of his knees

across Plaintiff's shoulders to hold him down and Deputy Latu Moala placed Plaintiff's legs in a

cross restraint hold. Deputy Juan Valdez attempted to search Plaintiff's pockets, but Plaintiff

continued to move around and pull away and attempted to hook his leg around the toilet. Olsen

determined that because they could not search Plaintiff's pockets, they would have to remove his

pants to avoid any contraband entering the facility. Plaintiff's pants were removed and searched.

Jail staff were in the isolation cell with Plaintiff for six minutes and 30 seconds. Olsen felt it was

unsafe to leave Plaintiff in handcuffs in the isolation cell. Due to Plaintiff's conduct, however,

Olsen believed that removing the handcuffs directly would be unsafe. Accordingly, staff exited

the cell and used a nylon mesh restraint ("a rip device") and the food port to attempt to remove

Plaintiff's handcuffs. Olsen described using the rip device in his deposition as follows:

> As we're exiting the cell, . . . there's one end [of the rip device] that's
> attached to the chain of the cuffs, and one end is what I call a running end.

> It's the length, right. You bring that through the food port, and you hold onto it, and you get the individual to back up to the food port . . . and put their hands to the food port so you can secure the risk while somebody takes off the handcuffs.

Gilmore Decl., Ex. 5 (Olsen Depo.) at 18. Plaintiff, however, pulled against the rip device and twisted his body towards the food port, "creat[ing] a fulcrum with his body" and "spinning against the actual length of the rip device." *Id*. This pulled Plaintiff's hands "out of position to have the handcuffs removed." Pedro Decl., Ex. 9, at 4. At deposition Plaintiff admitted that he was actively resisting any efforts to have his hands pulled through the food port. Olsen became concerned that the longer the struggle went on, the more likely it was that Plaintiff would be injured. One minute and 41 seconds after jail staff exited the insolation cell Olsen directed Deputy Kyle Rayborn to apply the taser to the back of Plaintiff's hand. The taser, however, did not have any effect on Plaintiff. After another two minutes of struggle, Olsen applied his taser to Plaintiff's forearm at which point Plaintiff stopped struggling and his handcuffs were removed. The total time to remove Plaintiff's handcuffs was four minutes.

At 8:11 p.m. on July 12, 2024, Nurse Ashley Adams observed Plaintiff through the isolation cell-door window because medical staff "typically do not go into the [isolation] cell, especially . . . [the] up-front cells . . . 'cause that means they're so aggressive that they can't . . . make it through the booking process, . . . unless it's . . . an emergent situation." Gilmore Decl., ECF 44, Ex. 8 (Adams Depo.) at 3. *See also* Pedro Decl., Ex. 9 at 3 ("Due to [Plaintiff] acting erratic, it was not safe for the nurse to physically assess" him). Adams observed Plaintiff was sitting on the cell floor, "agitated with pressured speech and intense eye contact, pupils dilated and PERRLA at 6 mm. RR even and unlabored, speech clear, skin appears dry and well-perfused. . . . Presentation is consistent with stimulant use." Lawson Decl., ECF 30, Ex. 1 at 8.

4 - OPINION & ORDER

Adams noted Plaintiff had a "1-2 cm lac[eration] on right eyebrow, bleeding slightly. Another 2 cm lac[eration] on top of head, also small about of blood." *Id.* Plaintiff "seemed afraid and delusional, making statements like, 'they're going to shoot me!'" *Id.* at 9. Adams "[r]eassured [Plaintiff] that he was safe in the cell and he calmed down somewhat." *Id.*

Adams observed Plaintiff through the door of the isolation cell again at 9:07 p.m., noting Plaintiff's "[r]espirations [were] even and unlabored," his skin was "dry and well-perfused," and he had a "[s]teady gait." Lawson Decl., Ex. 1 at 10. Plaintiff "appear[ed] intoxicated" and stated he was thirsty. Adams "[a]ttempted to give [him] Gatorade . . ., he [believed] it was poison and . . . dumped it down the sink." *Id.* At 10:57 p.m. Adams again viewed Plaintiff through the cell window and reported his "[r]espirations [were] even and unlabored" and his skin was "dry and well-perfused." *Id.*

On July 13, 2021, at 1:03 a.m. Melissa Thomas, R.N., observed Plaintiff. Plaintiff said to Thomas: "I need your help. I need medical. I need cleaned up! I don't know when I got hurt. I didn't do it myself!!! Would you treat your son like this?" Lawson Decl., Ex. 1 at 11. Thomas noted Plaintiff's "[r]espirations [were] even and unlabored," his skin was "dry and well-perfused," his speech was clear, and he was "alert/oriented x4," however, he still "appear[ed] intoxicated." *Id.* At 3:08 a.m. Thomas noted Plaintiff's "[r]espirations [were] even and unlabored" and his skin was "dry and well-perfused." *Id.* at 12. Plaintiff was "standing at [the] door with [his] forehead touching the glass, and [his] eyes closed." *Id.*

At 5:19 a.m. on July 13, 2021, Richard Witte, R.N., entered the isolation cell and conducted a physical examination of Plaintiff. Plaintiff's vital signs, including his temperature and blood pressure, were normal, but he had an elevated pulse of 104. Lawson Decl., Ex. 1 at 15.

Witte noted Plaintiff had "[s]uperficial lacerations, abrasions at hands, L shoulder, R dorsal foot" that Witte cleaned and covered with antibiotic ointment. *Id.* Witte noted "[n]o ongoing dressing care indicated" and permitted Plaintiff to keep the antibiotic ointment in the cell. *Id.*

On July 14, 2021, Plaintiff submitted a request to be seen by medical personnel expressing concerns about a possible broken rib and MRSA infection. At 1:11 p.m., Emily Marx, R.N., examined Plaintiff and noted he had "multiple recent superficial abrasions and bruises covering face, L shoulder, bilat arms, bilat knees, bilat feet. R hand with sores and swelling." Lawson Decl,, Ex. 1 at 16. Plaintiff reported "pain with deep breath" and did not "tolerate anything beyond gentle palpation" of his rib area. *Id.* Marx notified "medical regarding s/sx of infection including increased redness, swelling, warmth, drainage, pain, foul odor, or fever." *Id*. Marx scheduled Plaintiff for a visit with a doctor on July 15, 2021.

At 10:00 a.m. on July 15, 2021, Kelli McCurtain, R.N, examined Plaintiff and noted his skin was "W+D, very warm to touch forehead. Flushed face." Lawson Decl., Ex. 1 at 17. Plaintiff's right had and forearm were "grossly red and swollen. Hot to the touch. Difficult [for Plaintiff] to make fist w/R hand." *Id.* Plaintiff told McCurtain that he "feels like shit and his arm hurts like hell." *Id*. McCurtain noted that Plaintiff was at risk for "possible systemic infection" and advised Plaintiff we would be "sent to the hospital for further assessment and treatment." *Id.* at 18.

Plaintiff was transported to the hospital on July 15, 2021, where it was determined that he did not have any "obvious rib fracture," but he "present[ed] with sepsis from right upper extremity cellulitis." Lawson Decl., Ex. 2 at 7. David Goldberger, M.D., prescribed antibiotics and pain medication. He noted "[i]f [there is] evidence of worsening symptoms despite

conservative management, obtain hand surgery consultation." *Id*. Plaintiff's hand "continued to swell" and on July 16, 2021, he was operated on to clean and drain the "deep abscesses of the right distal forearm as well as multiple small superficial abscesses throughout the hand the wrist." *Id.* at 15. Plaintiff received IV antibiotics during his hospital stay and was discharged on July 17, 2021, "on another week of antibiotics." *Id.*

On July 10, 2023, Plaintiff filed a Complaint against Multnomah County and John Does 1-10 asserting (1) a claim under 42 U.S.C. § 1983 for "8th/14th Amendment Violations" against Does 1-10; (2) a claim under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), against Multnomah County; and (3) a state-law claim for "assault/battery" against Multnomah County.

On July 9, 2024, Plaintiff filed a Motion to Substitute Parties. On July 12, 2024, Multnomah County filed a Motion for Summary Judgment. The Court took the Motions under advisement on August 16, 2024.

## PLAINTIFF'S MOTION TO SUBSTITUTE PARTIES

Plaintiff moves to substitute Deputies Moala and Valdez, Sergeant Olson, and nurses Thomas and Adams for Does 1-10. Defendant objects on the bases that substitution is untimely and Plaintiff's § 1983 claim against these individuals is time barred.

### I.    Statute of Limitations

"Federal courts in § 1983 actions apply the state statute of limitations from personal-injury claims." *Anderson v. Scott*, No. 22-16086, 2023 WL 3563004, at *1 (9th Cir. May 19, 2023)(citing *Soto v. Sweetman*, 882 F.3d 865, 871 (9th Cir. 2018)). *See also Butler v. Nat'l Comm. Renaissance of Cal*., 766 F.3d 1191, 1198 (9th Cir. 2014)("Section 1983 does not contain

its own statute of limitations. Without a federal limitations period, the federal courts apply the forum state's statute of limitations for personal injury actions."). Personal-injury claims in Oregon must be commenced within two years of the injury. Or. Rev. Stat. § 12.110(1).

"[C]ivil rights claims [under § 1983] accrue, [however,] based on federal law, when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Anderson*, 2023 WL 3563004, at *1 (quotation omitted). *See also Gibson v. United States*, 781 F.2d 1334, 1340 (9th Cir. 1986)(citations omitted)("[A]lthough state law prescribes the statute of limitation applicable to section 1983 claims, federal law governs the time of accrual.").

## II.    Analysis

The last events that form the basis of Plaintiff's claims occurred no later than July 15, 2021, when Plaintiff was seen by MCDC medical staff and transported to the hospital for treatment. Accordingly, the limitations period for Plaintiff's § 1983 claims expired July 15, 2023. Plaintiff moved to substitute individuals for the Doe defendants on July 9, 2024, almost a year after the limitations period.

Plaintiff concedes he is moving to substitute parties beyond the limitations period, but asserts his amendment relates back to the original Complaint and, therefore, he should be permitted to substitute the individuals pursuant to Federal Rules of Civil Procedure 15(c). In the alternative, Plaintiff asserts the limitations period should be equitably tolled.

### A.    Relation Back

When "as here, 'the limitations period derives from state law, . . . [the Court must] consider both federal and state law and employ whichever affords the more permissive relation back standard.'" Fudge v. Bennett, No. 2:19-CV-01102-SB, 2021 WL 1414279, at *2 (D. Or.

Jan. 5, 2021)(quoting Butler v. Nat'l Cmty. Renaissance of Cal., 766 F.3d 1191, 1201 (9th Cir. 2014)), findings and recommendation adopted, No. 2:19-CV-01102-SB, 2021 WL 1414209 (D. Or. Apr. 13, 2021)).

### 1.    Federal Relation Back Rule

Federal Rules of Civil Procedure 15(c)(1) provides:

> (1) When an Amendment Relates Back. An amendment to a pleading relates back to the date of the original pleading when:
>
> * * *
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> > (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
> >
> > (ii) knew or should have known that the action would have been brought against it, *but for a mistake concerning the proper party's identity.*

Emphasis added. Defendant asserts that Rule 15(c) does not apply because substituting for a Doe defendant is not a mistake concerning a proper party's identity.

In *Boss v. City of Mesa,* the Ninth Circuit held that "[r]eplacing a 'John Doe' defendant with the actual name of a defendant is not a 'mistake' that allows relation back under Rule 15(c)(1)(C)." 746 Fed. App'x 692, 695 (9ᵗʰ Cir. 2018)(citing *Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1203–04 (9th Cir. 2014)). "Following *Boss*, district courts in the Ninth Circuit have universally recognized that Rule 15(c)'s relation back provision does

not apply to the untimely substitution of Doe defendants." *McKenzie v. Portland Police Div.*, No. 3:22-CV-01140-SB, 2023 WL 10354245, at *3–4 (D. Or. Sept. 1, 2023), report and recommendation adopted, No. 3:22-CV-1140-SB, 2024 WL 658865 (D. Or. Feb. 16, 2024)(citing *Deal v. Dasch*, No. 6:19-cv-01596-MK, 2023 WL 2707453, at *3 (D. Or. Mar. 30, 2023)(denying request to substitute a Doe defendant and holding that the plaintiff could not satisfy Rule 15's mistake requirement because "there has been no 'mistake' which would allow relation back"). *See also Finicum v. United States*, No. 2:18-cv-00160-SU, 2021 WL 3502462, at *9 (D. Or. Aug. 5, 2021)(holding that "the naming of Doe defendants is not a mistake for purposes of [Rule 15]"); *Smith v. Shartle*, No. CV-18-00323-TUC-RCC, 2021 WL 842144, at *4 (D. Ariz. Mar. 5, 2021)("[T]he Ninth Circuit has determined that simply '[r]eplacing a 'John Doe' defendant with the actual name of a defendant is not a 'mistake' that allows relation back under Rule 15(c)(1)(C).'").

The Court concludes pursuant to *Boss* that Rule 15(c)(1) does not allow Plaintiff's untimely substitution of the Doe defendants. The Court, therefore, looks to Oregon's relation back rule.

## 2. **Oregon Relation Back Rule**

Oregon Rule of Civil Procedure 23C governs relation back under Oregon law and provides:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against the party to be brought in by amendment, such party (1) has received such notice of the

> institution of the action that the party will not be prejudiced in maintaining any defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party brought in by amendment.

"Oregon law distinguishes between 'misnomer' cases, to which only the first sentence [of ORCP 23C] applies, and 'misidentification' cases, to which both sentences apply." *Finicum*, 2021 WL 3502462, at *7 (citing *Worthington v. Estate of Davis*, 250 Or. App. 755, 760-61 (2012)). "The former occurs when 'the plaintiff chooses the correct defendant and simply misnames it,' while the latter 'occurs when the plaintiff mistakenly sues a person or entity other than the one whose conduct allegedly harmed the plaintiff.'" *Id.* (quoting *Worthington*, 250 Or. App. at 760-61 ). "If, considering all the allegations of the original complaint and the summons, an entity could reasonably identify itself as the entity intended to be sued, a misnomer has occurred, and only the first sentence of the rule must be satisfied." *Id.* (simplified).

"Oregon courts have not decided whether the naming of a 'John Doe' defendant qualifies as a misnomer or a misidentification." *Glass v. Forster*, No. 1:18-cv-01859-MC, 2020 WL 3077868, at *1 (D. Or. June 10, 2020)(citing *Hagen v. Williams*, No. 6:14-cv-00165-MC, 2014 WL 6893708, at *7 (D. Or. Dec. 4, 2014)). Judges in this district, however, have held that when a plaintiff "intentionally [chooses] to name John Doe Defendants[,]" the case is automatically one of misidentification because it requires "a change in parties." *Hagen*, 2014 WL 6893708, at *7. *See also Fudge*, 2021 WL 1414279, at *4 ("The 'misidentification' reasoning of *Hagen* applies here because [the plaintiff] seeks to change a party by substituting newly-named individuals for Doe defendants."); *McKenzie*, 2023 WL 10354245, at *4 ("With respect to the mistake requirement, courts have held - similar to the Ninth Circuit's interpretation

of Rule 15(c) - that naming a Doe defendant is not a mistake concerning the identity of the party and therefore ORCP 23C's relation-back provision does not apply to the untimely substitution of Doe defendants."); *Glass*, 2020 WL 3077868, at *10 (The plaintiff's "decision to name Doe Defendants was intentional, based on a lack of knowledge, and was not a mistake. The proposed amendment . . .  does not relate back to the date of the original complaint [and] the proposed amendments seek to name those officers after the running of the two-year statute of limitations ... the claims would be untimely and the proposed amendment is therefore futile."); *Strong v. City of Eugene*, No. 6:14-cv-01709-AA, 2015 WL 2401395, at *5 (D. Or. May 19, 2015)("[A] lack, of knowledge regarding a defendant's identity is not a 'mistake' for purposes of OR. R. CIV. P. 23.")(quotation omitted).

The Court finds the reasoning of these cases to be persuasive and adopts it here. Accordingly, the Court concludes ORCP 23C does not permit relation back. The Court, therefore, concludes Plaintiff's proposed amendment and substitution does not relate back to the date of the original complaint and the proposed substitution seeks to name individuals after the running of the two-year statute of limitations. Plaintiff's § 1983 claim against the individual defendants would, therefore, be untimely.

**B.    Equitable Tolling**

Plaintiff asserts the Court should equitably toll the statute of limitations because he was unable to identify the individual defendants before the running of the limitations period:

> At that time no depositions had been conducted and it was impossible to determine what happened even from the videos. Depositions were not provided until April, June and July 2024 thus delaying further efforts to identify defendants. Plaintiff took detailed depositions in an attempt to identify those officers most likely engaged in the most serious physical contact. Most of the officers had some recollection of events but it is clear

that Moala, Valdez and Olsen were primarily involved in the problems in
the cell.

Pl. Mot., ECF 19, at 2.

For actions under 42 U.S.C. § 1983, courts apply the forum state's . . . law

regarding tolling, *Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004). *See also Bd. of Regents of*

*Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 484 (1980)(noting that in most § 1983 actions,

the state's tolling rules apply). It is unclear, however, whether Oregon permits equitable tolling

in the context of § 1983 and what the parameters of equitable tolling in Oregon, if allowed, may

be. *Monical v. Marion Cnty.*, No. 6:18-CV-103-YY, 2021 WL 228891, at *4 (D. Or. Jan. 22,

2021). The court noted in *Monical* that although "the Oregon Supreme Court [has] stated . . .

'various circumstances can toll [statutes of limitations'] expiration,' [t]he court did not explain

what those 'various circumstances' were." *Id.* (quoting *Shasta View Irrigation Dist. v. Amoco*

*Chems. Corp.*, 329 Or. 151, 162 (1999)). In addition, "the Oregon Court of Appeals [stated] . . .

'a statute of limitations may be tolled in certain circumstances but, with few exceptions, a statute

of ultimate repose may not be tolled.'" *Id.* (quoting *Cannon v. Or. Dep't of Justice*, 288 Or. App.

793, 798 (2017)). Accordingly, Oregon courts appear to contemplate application of equitable

tolling, even though the *Monical* court could not find any Oregon cases applying equitable

tolling in the context of § 1983. The court added that "[c]ourts in this district also have presumed

equitable tolling is available under Oregon law under at least some circumstances." *Id.* (citing

*Allen v. Nw. Permanente, P.C.*, 2013 WL 865967, at *6 (D. Or. Jan. 2, 2013), report and

recommendation adopted as modified, 2013 WL 865973 (D. Or. Mar. 7, 2013)("Equitable tolling

is used sparingly in Oregon. . . . [I]n Oregon, equitable tolling is available when circumstances

outside the control of the affected party make it impossible to comply with a statute of

limitations.")(quotation marks and citations omitted)); *Rodriguez v. Williams*, 2010 WL 1542092, at *3 (D. Or. Feb. 25, 2010), report and recommendation adopted, 2010 WL 1541962 (D. Or. Apr. 14, 2010)(noting Oregon's history of applying equitable tolling and concluding equitable tolling may be available but not under the circumstances of that case)). "Ninth Circuit opinions also provide some support for the proposition that Oregon accepts the doctrine of equitable tolling." *Monical*, 2021 WL 228891, at *4 (citing *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1048 (9th Cir. 2016)(stating that "equitable tolling is used sparingly in Oregon"); *Quillin v. State of Or.*, 127 F.3d 1136, 1139 (9th Cir. 1997) ("However, it may be possible that the Oregon courts will invoke principles of equitable tolling in order to review these claims ....")). The court concluded in *Monical* that "the Oregon Supreme Court likely would apply equitable tolling" and use the general equitable tolling test. *Id*. This Court agrees with the reasoning of *Monical* and adopts it here.

"The general equitable tolling test requires that a litigant establish (1) that he or she has been pursuing his or her rights diligently, and (2) that some extraordinary circumstance stood in his or her way." *Monical*, 2021 WL 228891, at *4 (citing *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012); *Booth v. United States*, 914 F.3d 1199, 1207 (9th Cir. 2019)). "The second element requires the litigant to show that extraordinary circumstances were the cause of his untimeliness and made it impossible to file the document on time." *Booth*, 914 F.3d at 1207.

In his Response to the Motion for Summary Judgment Plaintiff notes that he "does not challenge the use of force in the sallyport or the initial evaluation at the intake desk. The focus of this litigation are the uses of force in the isolation room." Pl.'s Resp., ECF 41, at

24. Plaintiff asserts that he could not tell which officers were involved in the events in the isolation cell before depositions were taken in 2024, well after the limitations period expired.[1] Defendant points out, however, that the use-of-force reports specify which officers were involved in the events in the isolation cell, these reports were available as public records before the limitations period expired, and Plaintiff could have received these reports through an Oregon public records request. *See* Or. Rev. Stat. § 192.314(1)("Every person has a right to inspect any public record of a public body in this state" except in circumstances not at issue here).

The reports generated by Sergeant Olson and Deputies Moala, Rayborn, Sacirovic, Swalley, Valdez, and Valdovinos between July 14 and July 22, 2021, and the Supervisor Review report, generated September 14, 2021, identify which individuals were in the isolation room and involved in the relevant events. For example, Deputy Moala's report states he went to the isolation cell and "was able to gain control of [Plaintiff's] legs by performing a cross leg restraint." Pedro Decl., ECF 22, Ex. 9 at 3. Moala indicated he was in the isolation cell when they attempted to search Plaintiff, when they removed Plaintiff's pants, and when the search was conducted. Moala confirms he was present and participating when deputies attempted to remove Plaintiff's handcuffs using the rip device and states: "I attempted to physically move [Plaintiff] with my hands to get him to place his arms out of the food port to no avail." *Id.* Similarly, Deputy Valdovinos noted in his statement that when Plaintiff was on the floor in the isolation room, he "started flapping his body on the floor" and "[s]taff lost control of [him,] . . after awhile staff was able to . . . hold control of major body parts." *Id.* at 10. Valdovinos states he "controlled [Plaintiff's] upper back by placing [his] left shin on it." *Id.* Valdovinos states he

---

[1] Plaintiff provides no explanation for the inability to identify the medical staff at issue in the portion of his § 1983 claim for denial of adequate medical care.

removed Plaintiff's bracelets and earrings and handed them to Deputy Swalley. Sergeant Olson

states in his report that "Deputy Valdovinos took control of [Plaintiff's] head to prevent him

from biting or spitting, [Olson] placed his left knee and shin across [Plaintiff's] shoulders to pin

his upper body to the floor, Dep. Moala crossed [Plaintiff's] legs and used a leg hold to prevent

him from kicking, Dep. Valdez attempted to complete a search" but was unable to do so because

Plaintiff's front pockets were inaccessible. Pedro Decl., Ex. 9 at 6. Olsen "ordered that a cutter

be used to remove [Plaintiff's] pants. Dep. Moala . . . cut away the pants and they were

removed" from the cell. *Id*. Olson also details the attempt to remove Plaintiff's handcuffs with

the rip device and names the deputies involved in that effort. Olsen notes he directed Deputy

Rayborn to deploy his taser when Plaintiff would not cooperate with efforts to remove his

handcuffs and managed to wrap himself up in the rip device and that Olsen then deployed his

taser to Plaintiff's right arm.

      Similarly the medical records set out dates, times, and staff who examined

Plaintiff; the manner of their examinations; and their findings. The use of force and medical

records were available through a public records request well before the limitations period expired

and Plaintiff does not allege that he was unable to make a public records request or that

Defendant blocked such a request. Plaintiff, therefore, has not established that "some

extraordinary circumstance stood in" the way of him determining which staff were involved in

the events in the isolation cell or with Plaintiff's medical care or that an extraordinary

circumstance "made it impossible [to substitute defendants] on time." *Booth*, 914 F.3d at 1207.

      The Court concludes Plaintiff has not established extraordinary circumstances

warranting equitable tolling of the limitations period exist and, therefore, amendment to

substitute the Doe defendants would be futile. Accordingly, the Court denies Plaintiff's Motion to Substitute Parties.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Multnomah County moves for summary judgment on Plaintiff's § 1983 claim against Doe defendants and *Monell* claim and for partial summary judgment on Plaintiff's state law assault/battery claim.

### I.    Standards

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    Individual § 1983 Claims

In Plaintiff's first claim he asserts Doe defendants violated his Eighth and/or Fourteenth Amendment rights when they used excessive force in the isolation cell, failed to provide adequate medical care, and supervisors failed to intervene or stop the violence against Plaintiff.

"As a general rule, the use of 'John Doe' to identify a defendant is not favored." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980)(citation omitted). "However, situations arise . . . whe[n] the identity of alleged defendants will not be known prior to the filing of a complaint." *Id.* "In such circumstances, the plaintiff should be given an opportunity through discovery to identify the unknown defendants[.]" *Id.* (citation omitted). This Court and other district courts in the Ninth Circuit have consistently held that the opportunity to name Doe defendants ends with the close of discovery. *See, e.g.*, *Bratcher v. Polk Cnty.*, No. 3:20-CV-02056-SB, 2022 WL 17184419, at *5 (D. Or. Sept. 1, 2022), report and recommendation adopted, No. 3:20-CV-2056-SB, 2022 WL 17178266 (D. Or. Nov. 23, 2022)(granting summary judgment as to claims brought against Doe defendants when they had not been identified or substituted at the end of discovery); *Ouma v. Clackamas Cnty.*, No. 3:12-cv-01465-HZ, 2014 WL 1874051, at *2 (D. Or. May 7, 2014)(dismissing claims against the Doe defendants when the plaintiff had "over a year since the filing of the case" to identify the Doe defendants but had not done so and finding that

the "use of John Doe is disfavored, but allowed through the end of discovery"); *Entsminger v. Aranas*, No. 316CV00555MMDWGC, 2021 WL 4394773, at *3 (D. Nev. Sept. 24, 2021) ("Because discovery has now closed and [the plaintiff] cannot provide the Doe Defendants' names, the Court finds that they should be dismissed without prejudice.").

As noted, this is not a situation in which the identity of alleged defendants could not have been known before the complaint was filed. Discovery closed on June 3, 2024, and Plaintiff did not name the Doe defendants before the close of discovery. In addition, the deadline to add parties and amend the pleadings closed June 3, 2024, and Plaintiff did not amend or add by that deadline. The Court, therefore, grants Defendant's Motion for Summary Judgment as to Plaintiff's first claim for violation of the Eighth and/or Fourteenth Amendment.

### III.    *Monell* Claim

In his second claim Plaintiff alleges the following "policies were the moving force behind the Constitutional violations":

> a. Failing to implement and enforce adequate policies and procedures regarding the use of force against pre-trial detainees;
>
> b. Failing to train on what constitutes a use of force and the objective reasonableness needed prior to exercising force;
>
> c. Failing to implement and enforce adequate policies and procedures regarding reporting, documentation, investigation, and discipline of use of force incidents by Multnomah County jail employees against detainees in custody;
>
> d. Failing to train Multnomah county employees, especially John Does, in proper use of force, medical care, and treatment of injured pre-trial detainees while in custody, including proper reporting when a use of force incident occurs;
>
> e. Having a widespread policy or procedure of pre-emptive strikes against prisoners;

19 - OPINION & ORDER

f. Failing to discipline Multnomah County employees following documented misconduct including failure to report use of force incidents;

g. Failing to train Multnomah County employees that verbal resistance alone does not justify the use of force;

h. Failing to monitor Multnomah County employees while interacting with and overseeing inmates, including not video recording all interactions and allowing jail employees to beat and abuse a pre-trial detainee suffering from mental health crisis;

i. Ratifying and approving of Multnomah county agents' and employees' mistreatment of pre-trial detainees and use of force against restrained detainees; and

j. Failing to provide timely and adequate medical care to pre-trial detainees injured by deputies inside the jail.

Compl. ¶ 31.

Defendant moves for summary judgment as to this claim on the basis that Plaintiff has failed to establish any policy or practice that was the moving force behind the alleged misconduct.

### A.    Standard

"Civil rights suits against local governments for constitutional violations by its officers cannot proceed on respondeat superior liability." *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1167 (9th Cir. 2022)(citing *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012)). "[A] plaintiff must instead establish that 'the local government had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation they suffered.'" *Id.* (quoting *Hernandez*, 666 F.3d at 636 and citing *Monell*, 436 U.S. at 691).

To impose liability on a municipality under § 1983 pursuant to *Monell*, a plaintiff must prove: (1) he "had a constitutional right of which he was deprived," (2) "the municipality

had a policy," (3) "the policy amounts to deliberate indifference to his constitutional right," and (4) "'the policy is the moving force behind the constitutional violation.'" *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973–74 (9th Cir. 2021)(quoting *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). "A plaintiff can satisfy *Monell's* policy requirement in one of three ways. First, a local government may be held liable when it acts "'pursuant to an expressly adopted official policy.'" *Id.* (quoting *Doughterty*, 654 F.3d at 900). "Second, a public entity may be held liable for a longstanding practice or custom." *Id.* (citation omitted). "Such circumstances may arise when, for instance, the public entity "'fail[s] to implement procedural safeguards to prevent constitutional violations' or, sometimes, when it fails to train its employees adequately." *Id.* (quoting *Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1143 (9th Cir. 2012)). Finally, "a local government may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Id*. at 974 (quotation omitted).

> **B.    Analysis**

In his Response to the Motion for Summary Judgment Plaintiff states that he has "allege[d] several types of custom or practice including failing to provide timely and adequate medical care to pre-trial detainees injured by deputies and the failure to implement and enforce adequate policies regarding use of force." Plaintiff, however, fails to present argument or evidence as to how several of the alleged policies were the moving force behind constitutional violations. Mere allegations are insufficient to survive summary judgment. *Bias*, 508 F.3d at

1218 (The nonmoving party must go beyond the pleadings and designate facts showing an issue

for trial).

Plaintiff states the following basis for the portion of his *Monell* claim related to

use of force:

> The decision to take the steps inside the cell seemed to be designed to
> comply with the policy of removal of cuffs and search of the person
> without consideration of the well being and safety of the pre-trial detainee.
> It was due to the actions of officers in implementing the policy that
> [Plaintiff] was injured and his rights were violated.

Pl. Resp. at 30. When "no argument exists that the express policies themselves were

unconstitutional, plaintiff [is] required to produce evidence creating a triable issue of fact

regarding the existence of an unconstitutional practice or custom." *Gordon*, 6 F.4th at 975 (citing

*Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999)). Plaintiff agrees that "MCDC has fully

adopted the *Graham* use of force standard." Pl. Resp. at 29. Under that standard officers should

consider the "totality of the circumstances" when using force including factors such as whether

the individual "'poses an immediate threat to the safety of the officers or others'" and "'is

actively resisting arrest or attempting to evade arrest by flight.'" *Williams v. City of Sparks*, No.

23-15465, 2024 WL 3734226, at *4 (9th Cir. Aug. 9, 2024)(quoting *Graham v. Connor*, 490

U.S. 386, 396 (1989)). Plaintiff does not assert Defendant's use-of-force policies are

unconstitutional. Plaintiff, therefore, is "required to produce evidence creating a triable issue of

fact regarding the existence of an unconstitutional practice or custom." Plaintiff, however, fails

to do so. Plaintiff does not point to any evidence that Defendant had a pattern or practice of

misapplying policies. Rather, Plaintiff points only to the circumstances of this case to support his

*Monell* claim. "An unconstitutional policy . . . must be 'so permanent and well settled as to

constitute a custom or usage with the force of law.'" *Gordon*, 6 F.4th at 974 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). *See also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985)(Generally, "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*.") The record lacks evidence of any other event involving similar conduct or alleged constitutional violations related to use of force in the isolation cell. Plaintiff, therefore, has not established that the use of force that occurred in the isolation cell was founded on practices of sufficient duration, frequency, and consistency that the conduct has become the traditional method of carrying out the use of force policy.

As to medical policies, Plaintiff concedes that there is "a legitimate reason" for Defendant's policy "not to allow nurses into the isolation cells when it is unsafe to do so," but asserts that policy "also puts the inmate at extreme risk of injury and death." Pl. Resp. at 31. "Under the [Fourteenth Amendment's] objective standard [for deliberate indifference], a defendant is not required to take '*all* available measures to abate a plaintiff's risk of suffering serious harm,'" only those measures that are reasonable. *Esser v. McIntyre*, No. 21-CV-03440-JST, 2021 WL 12253169, at *3 (N.D. Cal. Dec. 3, 2021)(quoting *Bremer v. Cnty. of Contra Costa*, No. 15-cv-01895-JSC, 2016 WL 6822011, at *9 (N.D. Cal. Nov. 18, 2016)(emphasis in *Bremer*)). Plaintiff notes he was "calm, reasonable and cooperative" "within a few hours" of being placed in the isolation cell. Pl. Resp. at 30. Plaintiff does not, however, appear to deny that he was not calm, reasonable, or cooperative at the time he was placed in the isolation cell or

23 - OPINION & ORDER

while he was in crisis. The record reflects that Plaintiff refused to drink the Gatorade provided by medical staff insisting it was poison and appeared intoxicated until after 1:00 a.m. on July 13, 2021. Plaintiff was examined by medical staff in person at 5:19 a.m. that same day when he was lucid and cooperative. When he was examined, he did not show any signs of infection or sepsis. It was not until 1:00 p.m., on July 14, 2021, that Plaintiff showed any signs of infection on examination and it was recommended at that time that he be scheduled for a hospital visit. There is no evidence that the policy not to allow nurses into isolation cells when it is unsafe to do so was the cause of Plaintiff developing sepsis or the moving force behind any alleged constitutional violation.

The Court, therefore, grants Defendant's Motion for Summary Judgment as to Plaintiff's *Monell* claim.

## IV.    State Law Claims

Defendant moves for partial summary judgment as to the portion of Plaintiff's state-law claim for assault/battery that involves conduct other than that which occurred inside the isolation cell. In his Response, as noted, Plaintiff makes clear that he does not challenge the use of force in the sallyport or the initial evaluation at the intake desk, rather he challenges only the use of force in the isolation room that "is not visible on the camera." Plaintiff did not respond directly to Defendant's request for partial summary judgment as to his assault/battery claim. The Court, therefore, grants Defendant's Motion for Summary Judgment as to Plaintiff's assault/battery claim to the extent it relates to the use of force other than in the isolation room that is not visible on camera. *See Lance Gordon Ocampo, v. Corizon, LLC*, No. 20-35990, 2022 WL 229093, at *2 (9th Cir. Jan. 25, 2022)("Defendants moved for summary judgment on Ocampo's state law

24 - OPINION & ORDER

claims. Ocampo, however, failed to respond to their arguments and the district court granted the motion as to these claims. The district court did not err by treating Ocampo's state law claims as waived.")(citation omitted).

## CONCLUSION

The Court DENIES Plaintiff's Motion to Substitute Parties, ECF 19, and GRANTS Multnomah County's Motion for Summary Judgment, ECF 20. The sole remaining issue for trial is Plaintiff's assault/battery claim related to the uses of force in the isolation room that are not visible on camera.

IT IS SO ORDERED.

DATED this ___9___ day of September, 2024.


_____
MARCO A. HERNÁNDEZ
United States Senior District Judge

25 - OPINION & ORDER